Larry RAPER, Petitioner-Appellant,
Cross-Appellee,

v.

Barry MINTZES, Respondent-Appellee,
Cross-Appellant.

Nos. 82–1139, 82–1184.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1982.

Decided April 27, 1983.

Floyd R. Gibson, Senior Circuit Judge, sitting by designation, concurred in part and dissented in part with opinion.

Arthur J. Tarnow, Detroit, Mich., for petitioner-appellant, cross-appellee.

Frank J. Kelley, Atty. Gen. of Mich., Thomas Nelson, Asst. Atty. Gen. (argued), Lansing, Mich., for respondent-appellee, cross-appellant.

Before JONES and CONTIE, Circuit Judges, and GIBSON, Senior Circuit Judge.*

CONTIE, Circuit Judge.

Both parties appeal from the district court's order granting in part and denying in part the petitioner's claim for habeas corpus relief pursuant to 28 U.S.C. § 2254. The central issue on appeal is whether comments made by the prosecutor in closing argument about the uncontradicted nature of certain evidence were unconstitutional references to the petitioner's failure to testify. We find that they were and affirm the district court's judgment in all respects.

I

In early 1976, the petitioner Larry Raper separated from his wife Brenda and Brenda filed for divorce. Shortly thereafter, Brenda Raper began dating Howard "Sam" Kobel. On March 21, 1976, the police were summoned to Brenda Raper's residence because the petitioner had ransacked the house. A television, a glass door and some dishes had been broken. Larry Raper told the police that he had lost his temper after finding another man with his wife. He also made a statement to the effect that "If I can't have her, nobody can." Several weeks later, Larry Raper saw his estranged wife dancing with Sam Kobel in a local bar. He assaulted Kobel in the bar and again in the parking lot after being asked to leave by the police. One week later, the petitioner came to Brenda's house at 11:00 p.m. Sam Kobel was watching television in the living room and two of Kobel's children were in a bedroom. Brenda answered Larry Raper's knock at the kitchen door and, according to Kobel, asked Larry "What are you doing here?" and "What do you have that for?" Kobel testified that he did not hear any response to Brenda's questions.

Shots were fired and Kobel ran into the kitchen where he saw Brenda Raper fall before him. Kobel ran out of the kitchen and into the bedroom where his two daughters were staying. He lifted both girls off the bed and pushed them down between the bed and the wall. Larry Raper entered the bedroom carrying his rifle. He and Kobel struggled for the gun and Kobel was shot in the neck. The petitioner then shot Kobel's children at close range and fled, leaving his rifle in the house. Only Sam Kobel survived the attack.

The petitioner did not testify in his own defense. Only two defense witnesses were called. A neighbor of Brenda Raper's testified that she saw Sam Kobel's truck at Brenda's house frequently and a psychiatrist who had been treating Larry Raper for depression testified that Raper had been optimistic about a reconciliation with his wife. The psychiatrist also testified that Raper was under control when he last saw him.

On closing argument, defense counsel speculated as to what may have been said at the kitchen door before Raper killed his wife. Defense counsel also told the jury, as he had in opening argument, that the petitioner had the right not to testify. On

* The Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designa-

tion.

rebuttal, the prosecutor attacked the defense counsel's speculation as to what happened at the kitchen door, noting that Sam Kobel's version was uncontradicted. In the course of his rebuttal argument, the prosecutor made several references to the uncontradicted nature of the evidence. No objection was made to the prosecutor's argument. Following closing arguments, the trial court instructed the jury that the petitioner had no obligation to testify or to prove his innocence, and that the jury was not permitted to consider his failure to testify for any purpose.

The petitioner was convicted of first degree murder of his wife, second degree murder of Kobel's children and of assault with intent to murder Kobel. He was sentenced to life imprisonment on each conviction. On direct appeal, the Michigan Court of Appeals affirmed the convictions. The petitioner subsequently filed an application for delayed appeal, challenging for the first time the prosecutor's comments as to the uncontradicted nature of some of the evidence. The Michigan Court of Appeals denied the application for delayed appeal and the Michigan Supreme Court refused to review that decision.

The district court found that the prosecutor's comments about the uncontradicted or unrefuted testimony of Sam Kobel were unconstitutional references to the petitioner's failure to testify since he was the only person who could have contradicted Kobel's testimony. The court granted the petition for habeas relief as to the first degree murder conviction, finding that the constitutional error was not harmless beyond a reasonable doubt with respect to the first degree murder issue of premeditation. However, the district court did find the error harmless as to the other convictions and rejected the balance of the petitioner's claims.

## II

The State contends that the petitioner is barred from challenging the prosecutor's argument because of a procedural default in failing to object to the prosecutor's argument at trial.[1]

In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court held that a state prisoner barred by a procedural default from raising a claim in state court could not litigate that same claim in a collateral challenge to his conviction pursuant to 28 U.S.C. § 2254 absent a showing of cause and prejudice. The *Sykes* rule was designed to minimize federal intrusion into the operation of the criminal justice systems of the states by insuring that, in the usual case, the state courts would have the first opportunity to correct constitutional errors. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). *Sykes* was also based on the premise that the principle of finality was best served by a rule that allowed a state to enforce its own rules of procedural default. *Id.*

Where a state appellate court does not rely at all on a procedural default but instead reaches the merits of a constitutional claim, the cause and prejudice standard of *Sykes* does not apply. *County Court of Ulster County v. Allen,* 442 U.S. 140, 147–54, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777 (1979); *Hockenbury v. Sowders,* 620 F.2d 111 (6th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981). In such a case, the rationale of *Sykes* is inapplicable since the state itself has chosen not to apply its procedural rules so as to bar the claim and the state has had the first opportunity to address the constitutional question.

Thus, proper application of *Sykes* requires the federal court considering a § 2254 petition to determine the basis of

---

1. The petitioner contends that Michigan's contemporaneous objection rule does not apply to this case. We disagree. In Michigan, failure to object to allegedly improper prosecutorial argument precludes appellate review absent a demonstration of manifest injustice. *People v. Duncan,* 402 Mich. 1, 16, 260 N.W.2d 58 (1977); *People v. Alexander,* 17 Mich.App. 497, 499–500, 169 N.W.2d 652 (1969). The only procedural default asserted on appeal before this court is the lack of a contemporaneous objection.

the state court's decision. The difficulty in this case lies in determining the exact basis for the Michigan Court of Appeals' denial of the petitioner's application for leave to file a delayed appeal. The entire order of the Court of Appeals is set out below:

In this cause an application for delayed appeal is filed by defendant-appellant, and an answer in opposition thereto having been filed, and due consideration thereof having been had by the Court,

IT IS ORDERED that the application be, and the same is hereby DENIED for lack of merit in the grounds presented.

*State v. Raper,* No. 48555 (Mich.Ct. of App., filed June 9, 1980). The order appears to be a standard form denial of leave to file a delayed appeal and gives no indication as to the basis for the decision. In this context, the state court's use of the word "merit" in its order does not conclusively establish that the decision was based on the merits.

■ Where the basis for the state court's decision is unclear, we believe that the federal habeas court must look to the arguments presented to the state court. *See, Martinez v. Harris,* 675 F.2d 51 (2d Cir. 1982). In *Martinez,* the Second Circuit announced the following rules for ascertaining the basis of the state court's decision: (1) if the state prosecutor only argued the merits of the petitioner's claim before the state court and failed to raise the procedural default issue, the federal court may assume that the state court ruled only on the merits; (2) if the prosecutor relied solely on the procedural default, the federal court may assume that that was the only basis for the state court's decision; and (3) if the prosecutor argued in the alternative, the federal court may assume that the state court did not rely solely on the merits unless it says so. *Id.* at 54–55.

2. *Griffin* is the paradigm of a direct comment case since the California constitution permitted such comments. In *Griffin,* the trial court told the jury that it could draw adverse inferences from the defendant's failure to testify as to facts or evidence within his knowledge. Several cases before this court have likewise involved direct comments. *See Eberhardt v. Bordenkircher,* 605 F.2d 275 (6th Cir.1979); *Rachel*

■ In this case, an examination of the State's briefs opposing the petitioner's application for delayed appeal reveals that the State did not raise the issue of the petitioner's failure to object at trial. We are unwilling to apply *Sykes* in a case such as this one where the State does not present the procedural default argument to the state court and the state court does not state that a procedural default was a basis for its decision. We therefore find that the district court correctly considered the merits of the petition.

### III

■ The fifth amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself. . . ." An important corollary to that right is that neither a prosecutor nor a trial judge may comment upon a criminal defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

■ The rule set forth in *Griffin* applies to indirect as well as direct comments on the failure to testify. Cases involving direct comments [2] pose little difficulty as the court must reverse unless the prosecution can demonstrate that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Eberhardt v. Bordenkircher,* 605 F.2d 275 (6th Cir.1979). Cases such as the present one, involving indirect comments on the failure to testify are more troublesome. General references to evidence as uncontradicted, while not recommended, may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence. *See United States v. Thurmond,* 541 F.2d 774 (8th Cir.1976), *cert.*

*v. Bordenkircher,* 590 F.2d 200 (6th Cir.1978); *Berryman v. Colbert,* 538 F.2d 1247 (6th Cir. 1976). The prosecutor's comments in *Eberhardt* (asking the jury to consider which other witnesses could have testified but did not) could be classified as an indirect comment were it not for the fact that the prosecutor punctuated his comments by gesturing to the defendant.

*denied,* 430 U.S. 933, 97 S.Ct. 1556, 51 L.Ed.2d 778 (1977). Such statements are more objectionable where the facts are such that only the defendant could have contradicted the evidence in question. *United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). However, we recently refused to adopt a *per se* rule that comments as to the uncontradicted nature of evidence violated *Griffin* even where the evidence in question could only have been contradicted by the defendant. *Butler v. Rose,* 686 F.2d 1163, 1170 (6th Cir.1982) (*en banc*). Rather, the court must conduct a "probing analysis of the context of the comments," *Robinson,* 651 F.2d at 1197, in order to determine "[w]hether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Butler,* 686 F.2d at 1170. We first look to the closing arguments of both counsel.

In his closing argument, the petitioner's trial attorney told the jury, as he had previously, that the petitioner had an absolute right not to testify and that his failure to testify could not be considered in any way. Later in his argument, he addressed the attack, apparently contesting the premeditation issue:

> That back door, April 19th, lets go to that back door. What do we know happened therein? Did we know from testimony and evidence? Why did Larry bring a gun? Ladies and gentlemen, I'll submit we'll never know. We did hear testimony to the effect that Larry carried a gun in the car with him. Why in heaven's name he ever carried it up to the house that morning or that late night, I don't know. What would he have known? Well, he knew Sam Kobel was there because Sam Kobel's truck was outside. What did Larry go back to the back door of his home with a gun for? Did he want to put Sam Kobel out? We don't know. We have bits and pieces of a conversation. Sam Kobel testified that he heard bits and pieces, and Mr. Koselka under-

lined those bits and pieces for us. Sam Kobel also said that there were other bits and pieces he didn't hear or he couldn't make out. Could they have been, "Please take me back, Brenda?" I don't know. I can only speculate. Maybe Larry wanted to come back, and Brenda said no. Maybe, and this is only speculation; maybe Larry took that gun up for another sham suicide attempt. What would happen if he had and one of the things that Sam didn't hear was Brenda saying, "I could care less; could care less if you blew yourself away." We don't have all the bits and pieces of that conversation. We don't have the whole thing. What happened to Larry Raper there? What was in his mind? Again, we can only use bits and pieces.

(App. 187–88). On rebuttal argument, the prosecutor stated:

> Now, I told you before that I wasn't there when these facts happened. I think the proofs show very clearly that counsel wasn't there either; that counsel made certain statements through this trial, throughout the arguments which has been no evidence whatsoever to back it up. Now, he wasn't in that bedroom. I wasn't either. Sam Kobel was. He told you what happened. . . .

(App. 192). The prosecutor then noted the other evidence against the petitioner beside Sam Kobel's testimony. He then stated:

> . . . The facts were presented, and no one contradicted anything that Sam Kobel said. No witness contradicted it. The physical facts don't contradict it.
>
> Counsel's not testifying. We've got to take the testimony that we heard from the witness stand, and every witness who testified from the witness stand about any facts of this case, we submit, shows that this Defendant committed premeditated murder, three counts of that, as well as the assault on Sam. His testimony has just not been refuted. It's not been contradicted.
>
> Counsel mentioned, of course, what conversations that were possible that happened at the door when Brenda went

to the door. Only with counsel's statement is that there is no evidence at all that what he said had any ring to the facts at all, no semblance to the facts. We do know half the conversation that was at that door, and it wasn't a long conversation. It's a very short one, but we do know what Brenda said at the door because we been told. Sam Kobel told us, and no one's refuted it. No one said, "No, that's not right. That's not what happened at the door," and you recall what happened at the door. "There's no car . here. What are you doing here? What are you going to do with that?" And then the shots. No argument. No sudden struggle.

(App. 193–94).

Later in his argument, the prosecutor addressed alleged inconsistencies between Sam Kobel's testimony and his prior statements to a police officer:

Let's look at Howard Samuel Kobel's testimony. No one's disputed it in any sense. According to Detective Yeutter, it was consistent with what he'd said at the preliminary hearing months ago; consistent with what he told Deputy Yeutter from his hospital bed shortly after this occurred.

. . . .

Now, counsel's indicating now that there are inconsistencies in what Sam Kobel said today or during the trial here, what he said at the preliminary examination, and yet Detective Yeutter says that just isn't so. There's no material inconsistencies . . . His story's been consistent throughout. The material facts, all the material facts are consistent with that testimony, and that testimony has not been disputed. No one, no one witness has contradicted the testimony, the events of that evening as relayed to you by Sam Kobel.

(App. 196–98).

■ The above quoted portions of the prosecutor's argument which referred to Sam Kobel's testimony as uncontradicted or unrefuted with respect to the events of April 19 could be construed as indirect references to the petitioner's failure to testify since he was the only person besides Kobel who could have testified about those events. Mindful of our recent ruling in *Butler* that no *per se* rule can be applied under these circumstances, 686 F.2d at 1170–71, we nevertheless find that the district court was correct in finding a constitutional violation.

The State argues that this case is controlled by *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and, consequently, also by our recent decision in *Butler* in which we found *Lockett* to be controlling. "In both cases the defense attorney gave the jury reason to believe they would hear from the defendant, and thus focused on the silence of the defendants who elected not to take the stand." *Butler,* 686 F.2d at 1173. Once so focused, comments as to the uncontradicted nature of certain evidence added little to the jury's awareness of the defendant's failure to testify.

This case is distinguishable from both *Lockett* and *Butler* in that no defense was ever promised, and thus, the jury's attention was not focused on the petitioner's silence. In fact, defense counsel had indicated in *voir dire* and in opening argument that the petitioner would not testify by impressing upon the jury that the petitioner was presumed to be innocent and that his failure to testify could not be held against him in any way. If such a statement serves to "focus" the jury's attention on the defendant's silence, *Lockett* would have a much broader effect than we gave it in *Butler.* We are unwilling to apply *Lockett* to these facts.

It is true that the petitioner's trial counsel did not object to the prosecutor's argument despite the fact that he was well aware of the defendant's right not to testify. *Compare Rachel v. Bordenkircher,* 590 F.2d 200 (6th Cir.1978) (defense counsel's failure to object due to inexperience or lack of knowledge). It is also notable that the trial court gave a clear and forceful closing instruction to the jury on the petitioner's right not to testify. While a prompt curative instruction after the improper comments were made would have been prefera-

ble, there was no opportunity for such an instruction here due to the lack of an objection.

Under the particular facts of this case, however, we find that the prosecutor's statements constituted improper references to the petitioner's decision not to testify. We are unable to conceive of any other reasonable inference which could be drawn from the prosecutor's comments. *See Steele v. Taylor,* 684 F.2d 1193, 1205 (6th Cir.1982). The State argues that the prosecutor's argument was calculated to rebut defense counsel's speculations.[3] In *United States v. Harris,* 627 F.2d 474 (D.C.Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 375, 66 L.Ed.2d 229 (1980), the court held that no *Griffin* violation occurred where the prosecutor rebutted defense counsel's speculative arguments by telling the jury that "there is no evidence in this case one way or the other except the evidence the government has presented." 627 F.2d at 475. *Harris* is distinguishable from the present case in that it involved a comment directed to evidence which could conceivably have been contradicted by witnesses other than the defendant. In the present case, Kobel's testimony clearly could only have been contradicted by the petitioner.

*Harris* is also distinguishable from this case in that it involved an isolated comment whereas the prosecutor in this case made at least five indirect references to the petitioner's failure to testify.[4] Several of these references referred to the failure of any *witness* to testify as opposed to the general remark in *Harris* about the lack of conflict-

ing evidence. We believe that the fact that the prosecutor made repeated comments about the uncontradicted nature of the evidence is the dispositive factor in this case.[5] Each time the prosecutor made such a comment, he further increased the likelihood that the jury would draw an improper reference. As Judge Wald noted in *Harris,* "the line between a legitimate rebuttal of the defense arguments and an indirect comment on the fact that the defendant has not taken the stand is often a very thin one." 627 F.2d at 476. We believe the prosecutor crossed the line in this case. His repeated statements as to evidence which could only have been contradicted by the defendant created a situation where the jury "naturally and necessarily" would construe the comments as a reference to the petitioner's failure to testify.

We agree with the district court that the error was harmless[6] with respect to all of the convictions except for the first degree murder conviction. We find no merit in the balance of the petitioner's claims.

Accordingly, the district court's judgment is AFFIRMED in all respects.

FLOYD R. GIBSON, Senior Circuit Judge, concurring in part and dissenting in part.

Respectfully, I dissent from that part of the court's opinion affirming the granting of the writ of habeas corpus. I agree that the issue of the prosecutor's statements is properly before the court. However, I be-

---

3. We note that the prosecutor could have effectively rebutted the speculative arguments of defense counsel by telling the jury that the defense counsel's statements were mere speculation and were not evidence.

4. The references are:
   1. "The facts were presented and no one contradicted anything that Sam Kobel said. No witness contradicted it." App. 193.
   2. "[Kobel's] testimony has just not been refuted. It's not been contradicted." App. 193.
   3. "Sam Kobel told us, and no one's refuted it. No one said, 'No that's not right. That's not what happened at the door.'" App. 193.

4. "No one's disputed [Kobel's testimony] in any sense." App. 196.
5. "No one, no one witness has contradicted the testimony, the events of that evening as relayed to you by Sam Kobel." App. 198.

5. We do not suggest that any magic number will constitute a violation of *Griffin* but the number of comments, along with their nature, is a key factor.

6. We disagree with the Seventh Circuit's apparent conclusion that the harmless error doctrine does not apply to *Griffin* violations. *See United States v. Hastings,* 660 F.2d 301 (7th Cir.1981), *cert. granted,* 456 U.S. 971, 102 S.Ct. 2232, 72 L.Ed.2d 844 (1982).

lieve that the comments did not violate petitioner's right against self-incrimination.

There are two reasons why I think the prosecutor's comments on the uncontradicted nature of the evidence did not reflect on petitioner's failure to testify. First, the evidence could have been contradicted by sources other than petitioner's testimony. In fact, of the five references to the uncontradicted nature of the evidence, see p. 167 n. 4, *ante*, in four of them the prosecutor specifically referred to potential contradictory sources other than petitioner. Second, I believe the prosecutor had the right to emphasize the unsupported nature of defense counsel's speculation.

The majority erroneously assumes that only petitioner could have contradicted the evidence presented at trial. Pp. 166, 167, *ante*. However, contradictory evidence could have come from other sources, such as persons to whom Kobel described the events,* or perhaps physical evidence which may have indicated petitioner's intentions regarding his wife. Four of the five times the prosecutor referred to the uncontradicted nature of the evidence he specifically referred to sources other than petitioner that could have offered contradictory evidence or could have offered support for defense counsel's speculation. These four statements are as follows:

1. The facts were presented, and no one contradicted anything that Sam Kobel said. No witness contradicted it. *The physical facts don't contradict it.*

2. *[E]very* witness who testified from the witness stand about any facts of this case, we submit, shows that this Defendant committed premeditated murder, three counts of that, as well as the assault on Sam. His testimony has just not been refuted. It's not been contradicted.

3. No one's disputed [Kobel's testimony] in any sense. *According to Detective Yeutter,* it was consistent with what he'd said at the preliminary hearing

month's [sic] ago; consistent with what he told Deputy Yeutter from his hospital bed shortly after this occurred.

4. [C]ounsel's indicating now that there are inconsistencies in what Sam Kobel said today ..., and yet *Detective Yeutter says that just isn't so. There's no material inconsistencies* .... His story's been consistent throughout. The material facts, all the material facts are consistent with that testimony, and that testimony has not been disputed. No one, no one witness has contradicted the testimony, the events of that evening as related to you by Sam Kobel.

see pp. 165–166, *ante.* (Emphasis added).

The majority, by isolating certain statements of the prosecutor, p. 167 n. 4, *ante*, makes it appear that the references to the uncontradicted nature of the evidence highlighted petitioner's failure to testify. When the statements are read in context, this is not so. The only statement as to the uncontradicted nature of the testimony without an accompanying reference to evidentiary sources other than petitioner was the following: "Sam Kobel told us, and no one's refuted it. No one said, 'No, that's not right. That's not what happened at the door.'" P. 166, *ante.* This statement was the third of the five prosecutorial references to the uncontradicted nature of the evidence. Because it was both preceded and followed by suggestions as to sources of contradiction other than petitioner, I believe that even this statement does not make an improper reference to petitioner's failure to testify.

The second reason I disagree with the majority is that I believe the prosecutor has a basic right to meet the speculative defenses and arguments raised by defense counsel and here the prosecutor's statements fell within his right to comment on defense counsel's speculation and on what the evi-

* In fact, a detective said Kobel's statements were always consistent. See p. 166, *ante.*

dence shows. A prosecutor is entitled to rebut defense counsel's speculations. *United States v. Harris,* 627 F.2d 474, 476 (D.C. Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 375, 66 L.Ed.2d 229 (1980), *cited at* p. 167, *ante. See United States v. Normile,* 587 F.2d 784, 787–88 (5th Cir.1979). The majority attempts to distinguish *Harris* on the basis that the evidence in that case could conceivably have been contradicted by witnesses other than the defendant. P. 167, *ante.* This distinction is illegitimate for two reasons. First, as I have explained, Kobel's testimony could have been contradicted by sources other than petitioner. Second, the *Harris* court makes no reference whatsoever to whether evidence could have come from any source other than the defendant and the court makes no indication that the possible sources of contradictory evidence affected its decision in any way.

The majority also attempts to distinguish *Harris* on the basis that it involved an isolated reference whereas in the instant case there were five references. P. 167 n. 4 *ante.* As explained above, the prosecutor specifically referred to possible sources of evidence other than petitioner in four of his comments. Even if the fifth comment were considered a reference to petitioner's failure to testify, it was an isolated comment.

The majority gives prosecutors too narrow a range of permissible comment to rebut what appears to be unbounded and unfounded speculation. The majority would limit the prosecutor to telling the jury that defense counsel's statements were mere speculation and were not evidence. P. 167 n. 3, *ante.* The prosecutor did that in the instant case. P. 165, *ante.* I see nothing wrong with the prosecutor making additional statements so that the jury will believe him when he says the statements were mere speculation. The prosecutor carefully went through the evidence, pointed out that all the evidence supported his theory of the case, and left the jury with the conclusion that that defense counsel's remarks were indeed mere speculation. The majority erroneously assumes that just because a prosecutor tells

the jury that defense counsel's arguments are speculation, the jury will believe that defense counsel's comments are no more than that. I will not make such an assumption. We are here dealing with a particularly brutal trilogy of murders, the evidence on which points unerringly at petitioner, whose constitutional rights were adequately respected in the state court proceeding.

Because the prosecutor did not refer to a matter about which only the accused could offer evidence and because the prosecutor's comments were merely statements on the state of the record invited by the defense, I dissent.