**Frederick SPALLA, Petitioner,**

v.

**Dale FOLTZ, Respondent.**

**Civ. No. 84–CV–2425–DT.**

United States District Court,
E.D. Michigan, S.D.

July 15, 1985.

Stuart B. Lev, Asst. Defender, State Appellate Defenders Office, Detroit, Mich., for petitioner.

Thomas Kulick, Asst. Atty. Gen., Corrections Div., Lansing, Mich., for respondent.

## OPINION AND ORDER

COHN, District Judge.

### I.

#### A.

Petitioner, presently confined to the State Prison of Southern Michigan, challenges his conviction for second degree murder, M.C.L. § 750.317, in habeas corpus, 28 U.S.C. § 2254. His petition includes a 42 U.S.C. § 1983 claim for injunctive and declaratory relief; this claim is subsumed in the decision on the habeas action.

On February 28, 1976 petitioner was convicted by an Oakland County Michigan jury of first degree murder, M.C.L. § 750.316, and sentenced to life imprisonment. The

conviction was affirmed by the Michigan Court of Appeals with a dissent, 83 Mich. App. 661, 269 N.W.2d 259 (1978), but reversed by the Michigan Supreme Court for the reasons expressed in the Court of Appeals dissent, 408 Mich. 876, 290 N.W.2d 729 (1980).

On retrial, on August 28, 1981, Petitioner was again convicted by a jury of first-degree murder and again sentenced to life imprisonment. On March 3, 1983, the Michigan Court of Appeals affirmed the conviction in an unreported opinion. (Docket No. 60683). The Michigan Supreme Court, however, on April 27, 1984, reduced the conviction to second-degree murder because of insufficient evidence of premeditation. M.C.L. § 750.317. 419 Mich. 863, 346 N.W.2d 841 (1984). Petitioner was resentenced on October 2, 1984, to a term of life imprisonment.[1]

#### B.

The petition before me was filed on July 24, 1984 raising only two issues. On January 16, 1985 I denied the petition and on February 4, 1985 I granted a motion to amend the petition and raise different issues.

### II.

#### A.

Petitioner first argues that the evidence against him was insufficient to support his conviction as a matter of law. This claim requires that I review the evidence in a light most favorable to the prosecution to see if each element of the crime was established beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[2] I may not

---

**1.** Because his sentence is for second degree murder, petitioner is eligible for parole after ten years served. M.C.L. § 791.234(1).

**2.** The elements of the crime of second degree murder in Michigan are as follows: (1) that the deceased died, (2) that the death of the deceased was caused by an act of the defendant, (3) that the act of the defendant causing the death of the deceased was not justified or excused or com-

mitted under circumstances making the act of defendant a lesser crime, and (4) that the defendant intended to kill the deceased, or that the defendant committed a wanton and willful act the natural tendency of which was to cause death or great bodily harm to the deceased. Michigan Criminal Jury Instructions 16:3:01.

reverse the jury's verdict if there is substantial evidence to support it. *United States v. Chandler*, 752 F.2d 1148, 1151 (1985). The evidence must afford a substantial basis from which a fact in issue can reasonably be inferred. *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir.1985). Moreover,

> the relevant question for the federal court in the habeas corpus proceeding is not whether it believes the evidence at the state trial established guilt beyond a reasonable doubt, but whether, after viewing the totality of the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Id.* at 1147. I must draw all available inferences and resolve all credibility issues in favor of the jury's verdict. *Id.* "Only when the record evidence cannot support a finding of guilt beyond a reasonable doubt can we hold that there has been a constitutional denial of due process." *Id.* The prosecution need not negate every reasonable theory consistent with innocence. *Jackson, supra,* 443 U.S. at 326, 99 S.Ct. at 2792; *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).[3]

### B.

The record showed that on August 20, 1975, at about 7:30 p.m., petitioner and Ronald Furby left Furby's house just outside Utica, Michigan. They were observed leaving by Steven Bonno who thought the car they left in was a Vega and described it as goldish-colored or coppertone in color. Petitioner told Bonno that the two of them were driving north to Lake Orion.[4] Petitioner was driving a 1974 brownish Dodge Colt he had borrowed from a Ruth Kuehn Briggs. Petitioner had picked up the car from her at 5:30 p.m. in New Baltimore.[5]

At about 7:45 p.m., James Malatesta heard gunshots coming from a cornfield just off of Snell Road west of Rochester, Michigan. This field is directly between Furby's home and Lake Orion. On investigating, he found Furby's body. He then heard two car doors slam and then saw a two-door small car drive onto Snell Road. He described the car as having a copperish color. He thought it might be a Nova. Although he said it could have been Briggs' Dodge Colt, he was not able to positively identify it.[6]

Ruth Spencer, at about 7:50 p.m., while she was driving down Snell Road, she saw

---

**3.** Respondent argues that the Michigan Court of Appeals' determination that the evidence was legally sufficient is entitled to the presumption of correctness under 28 U.S.C. § 2254(d). To a certain extent, this argument is supported by *Brown, supra,* 752 F.2d at 1147:

> [U]nder 28 U.S.C. § 2254, the factual findings of the state court are presumed to be correct, unless one of the conditions set forth in 28 U.S.C. § 2254(d)(1)–(8) is met. To overcome the presumption of correctness, the petitioner must establish by convincing evidence that the factual determination in the state court was erroneous. And the jury's resolution of questions of credibility and demeanor—and there were many in this case—is entitled to "special deference", *Patton v. Yount,* — U.S. ——, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

I do not accept this position, however, for a number of reasons. First, despite what *Brown* says, § 2254(d) applies, by its own terms, only to state *court* findings of fact and not to jurors' credibility determinations. Second, the citation to *Patton* is inapposite. *Patton* did not deal with a sufficiency of the evidence question but with the state court's finding that the jury in the case

had been impartial. Third, *Jackson* clearly imposes on the court reviewing a sufficiency claim the duty to make an independent determination of the evidence's sufficiency. *Delk v. Atkinson,* 665 F.2d 90, 94 (6th Cir.1981). Hence, *Brown's* dicta conflicts with *Jackson's* clear command. A sufficiency of the evidence question is a legal question; the presumption of correctness has no place in it. In fact, *Jackson's* standard would be meaningless if the presumption of correctness were applied. Because *Brown* conflicts with both *Jackson* and *Delk,* I reject it on this point. See generally, *Boles v. Foltz,* 559 F.Supp. 1302, 1305–1306 (E.D.Mich.1983). Respondent did not argue this point at oral argument.

**4.** III/690–691. The transcript of the trial record consists of three volumes in which the pages are consecutively numbered. Citations to the record are by volume and page numbers thusly ——/——.

**5.** III/683.

**6.** III/663–667.

"an orange color, not real orange, but ... a definite orange-brown color" pull out of a cornfield and almost hit her and then drive away very quickly. She thought that the car might be a Vega. She too stated that it could have been the Dodge Colt but was not sure.[7]

Bernard Stechschulte, between 7:30 and 8:00 p.m., saw a buff color subcompact car driving down Snell Road very quickly.[8]

Paul McGrath, a friend of petitioner's, saw petitioner driving eastbound between 8:00 and 8:10 p.m. on Twenty-Four Mile Road by Dequindre Road. Although he knew the car petitioner was in belonged to Briggs, he described it as a brown or tan Opel Cadet. Although he went between fifteen and twenty miles over the speed limit trying to catch up with petitioner, he was unable to do so.[9]

Bonno, Malatesta, Spencer, Stechschulte and McGrath each describe the car they saw as small, two-door, with a sloping roof and generally of the same color.

Petitioner gave the car back to Briggs at her place of work, Lou's Lounge, in New Baltimore at about 8:30 p.m.[10]

Early the next morning, Oakland County Detective Gregory Putman talked with petitioner. Petitioner admitted picking up Furby at Furby's house at about 7:30 p.m. in the 1974 Dodge Colt. Petitioner also admitted giving back the car to Briggs in New Baltimore at about 8:30 p.m. Petitioner told Putman that the last he saw of Furby was after he gave the car back to Briggs when he saw Furby walking toward the docks on Lake St. Clair.[11]

A crumpled pack of Marlboro cigarettes was found in the field close to Furby's body.[12] Furby smoked Kool cigarettes.[13]

Petitioner smoked Marlboros.[14] Both Marlboro and Kool cigarette butts were found in the Dodge Colt's ashtray.[15]

Putman said that it took him fourteen minutes to drive the 8.4 miles from Furby's house to the cornfield on Snell Road in his eight cylinder car at the speed limit at 5:00 a.m. He also testified that it took him thirty-seven minutes to drive the 25.2 miles between the cornfield on Snell Road to Lou's Lounge in New Baltimore under the same conditions travelling via Twenty-Four Mile Road.[16]

### C.

The proper resolution of petitioner's first claim involves an analysis of two decisions by the Court of Appeals for the Sixth Circuit. The first is *Speigner v. Jago*, 603 F.2d 1208 (6th Cir.1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980). In that case:

[T]he victim's automobile was stopped at 5:02 a.m., a few hours after his murder, a short distance from the place where his body was discovered. At that time, blood stains of the victim's type were in the car; a bloody but unidentified fingerprint was on the door; a sawed-off shotgun was under the passenger's seat; a vent window was shattered and glass was strewn on the floor. From this evidence, a jury could reasonably infer that the victim's car might have been at the scene of his murder. When we add to this inference the facts that petitioner was a passenger in the vehicle when it was stopped at 5:02 a.m., that he was seated directly over the shotgun, and that he later admitted knowing both the victim and the driver of the vehicle, we must conclude that the record in this

7. III/655–657.

8. III/703.

9. III/725, 744. It is significant that McGrath confused the identity of the car although he was familiar with it.

10. III/684.

11. III/756/757.

12. III/708.

13. III/639–640.

14. III–781.

15. III/710.

16. III/259–260.

case contains "some" evidence relevant to the elements of second degree murder. *Id.* at 1211.

In a two to one decision, the Sixth Circuit found the evidence in *Speigner* legally insufficient to convict. The prosecution was unable to show how long the petitioner had been in the victim's car. Moreover, the petitioner was never connected with the shotgun other than by proof that it was under his seat when he was arrested. Further, although the victim died of two pistol shots and one shotgun blast, the shotgun found in the car was never connected with the crime. The Sixth Circuit found the evidence too speculative to be sufficient. See also *Fuller v. Anderson*, 662 F.2d 420, 424 (6th Cir.1981), *cert. denied*, 455 U.S. 1028, 102 S.Ct. 1734, 72 L.Ed.2d 150 (1982).

The second Sixth Circuit case involved *Speigner*'s co-defendant, *Scott v. Perini*, 662 F.2d 428 (6th Cir.1981), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982). In a two to one decision, the Sixth Circuit distinguished *Speigner*. Unlike Speigner, Scott had given two separate statements to the police and then testified. Each of his versions was different. In the first version he admitted having been with Speigner and the victim just before the murder had occurred. Based on this evidence, the Sixth Circuit said:

> The jury could likewise have concluded ... that Scott and Speigner formed a decision to kill [the victim] and either or both of them carried out the plan by shooting [him] with his own pistol, later discarded, and by shooting him in the back of the head with the sawed-off shotgun which was later found in the car in which they were stopped.

\* \* \* \* \* \*

Under *Jackson v. Virginia, supra,* the primary emphasis must always be upon that evidence which was in fact presented to the jury. When sufficient evidence is presented from which a jury can conclude guilt beyond a reasonable doubt, it is not for the appellate court to ponder why other evidence was not presented.

\* \* \* \* \* \*

The permissible inferences from the statements and testimony of Scott place [the victim] in his own car in the presence of both Scott and Speigner at the time of the murder, a circumstance which is altogether missing in evidence presented in Speigner's trial.

*Id.* at 434, 435. The Sixth Circuit acknowledged that "mere presence" at the scene is insufficient under Ohio law to convict as an aider and abettor. *Scott*, however, was placed within a time frame from which the jury could have concluded that Scott, Speigner, and the victim were together. *Id.* at 434, fn. 8.

### D.

 I conclude that the facts here more closely resemble *Scott* than *Speigner*, i.e. that petitioner killed Furby, see *id.* at 434. Here, the prosecution failed to show motive. However, in Michigan, as in Ohio, motive is not an element of the crime of murder. *People v. Cipriano*, 238 Mich. 332, 335, 213 N.W. 104 (1927). The prosecution also failed to show a murder weapon. Petitioner, however, was questioned by the police shortly after the murder. As in *Scott*, the jury could have reasonably concluded that petitioner discarded the gun by the time he was questioned.

As in *Scott*, petitioner and Furby were together just before the murder. Importantly, petitioner admitted being alone with Furby less than half an hour before he was obviously murdered.

Petitioner also lied to Putman when questioned.[17] I do not dispute petitioner's contention that, standing alone, opportunity combined with a false statement is insufficient.[18] The facts here, however, show substantially more than mere opportunity. Three witnesses gave identification testi-

---

17. Petitioner's counsel, in closing argument, admitted that this statement to Putman was a lie.

18. Petitioner cites *People v. Besonen*, 4 Mich. App. 131, 136, fn. 2, 144 N.W.2d 653 (1966), for

this position. In *Besonen* the Michigan Court of Appeals said:

> It is often fruitless to seek precedents to support an argument involving sufficiency of the evidence but it seems clear that the people

mony concerning the car that left the cornfield right after the murder. From this testimony the jury could have reasonably concluded that it was petitioner's car. In addition, the jury could reasonably have concluded that it was Petitioner's cigarettes that were found on the scene of the crime. Lastly, petitioner was seen going in a direction from the scene of the crime at a high rate of speed shortly after the victim was discovered and gave a false explanation of the circumstances of their parting.

As in *Delk, supra*, 665 F.2d at 100, "Much of the evidence was of a type which did not involve credibility or resolution of conflicts." Although the evidence in the case was mostly circumstantial, the law generally does not distinguish between circumstantial and direct evidence. *Scott, supra*, 662 F.2d at 434, fn. 7. Based on the evidence at trial viewed in a light most favorable to the prosecution I conclude "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt", *Jackson, supra*, 443 U.S. at 319, 99 S.Ct. at 2789.

### III.

### A.

Petitioner next argues that the prosecution, in closing rebuttal argument, adverse-

must show more than mere opportunity to commit the crime, coupled with false exculpatory statements.... As Chief Justice Shaw noted in the famous case of *Commonwealth v. Webster*, 5 Cush [59 Mass] 295, 317, "An innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs."
The citation to *Webster*, however, is misleading. The complete paragraph from which the quotation in *Besonen* is taken in *Webster* reads:
To the same head may be referred all attempts on the part of the accused to suppress evidence, to suggest false and deceptive explanations, and to cast suspicion, without just cause, on other persons: all or any of which tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs.

ly commented on his Fifth Amendment right not to testify. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The disputed statements are as follows:

No doubt that when the Defendant shot and killed Ron Furby that the evidence has proven overwhelmingly that he did, he had a reason for doing that, but there was no evidence before you as to what that reason was.[19].

\* \* \* \* \* \*

But when you consider the lack of motive and the lack of evidence, I ask that you consider how that might be proved. Who would know the motive? The killer would know the motive and the evidence is proven that the killer is the Defendant, Frederick Spalla. Yet when Frederick Spalla was questioned about the police, what did he do? He lied to them in every detail, he lied to them. Who else might know the motive? Well, perhaps Ron Furby might. But as the saying goes, dead men tell no tales.[20]

The Defense began their argument by saying the Defendant didn't kill Ron Furby.[21] Well, weigh all that evidence and then ask yourselves the truth or falsity

59 Mass. at 316–317.
Petitioner was not "placed by circumstances in a condition of suspicion and danger." Although Putman had informed Petitioner of his *Miranda* rights, he did not tell him that Furby had been killed until after petitioner had given him a false statement.

**19.** III/864.

**20.** III/865.

**21.** In opening argument, petitioner's counsel said:
The question for you is who is the person who killed the deceased. Ricky Spalla did not kill the deceased. The evidence that is going to be presented is not going to show you Ricky Spalla killed the deceased. In fact, you can see from the evidence that Ricky Spalla did not. I think some of you sadly also, will see at the conclusion of the trial you'll have virtually no better idea who killed the deceased than you have at this moment.

because that's the issue. That is the issue, whether or not the Defendant killed Ron Furby.[22]

B.

■ Because this is a habeas case and not a direct appeal, the inquiry on this issue is less stringent. *United States v. Robinson*, 716 F.2d 1095, 1099 (6th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 722, 79 L.Ed.2d 183 (1984).

■ A distinction is drawn between a direct comment on the defendant's right not to testify and on an indirect comment. *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir.1983). If the comment is direct, a conviction will be reversed unless the error was harmless beyond a reasonable doubt. *Id.* Here, however, the statements were not direct comments on Petitioner's right not to testify. Consequently, the cases cited by Petitioner, *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir.1979), *Rachel v. Bordenkircher*, 590 F.2d 200 (6th Cir. 1978),[23] and *Berryman v. Colbert*, 538 F.2d 1247 (6th Cir.1976), are distinguishable.

■ In determining whether the argument constitutes an indirect comment on the defendant's right not to testify, four factors must be analyzed: (1) whether the comments were "manifestly intended" as such and would not naturally and necessarily be taken as such by the jury, *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir.1982), (2) whether the comments were isolated or extensive, (3) whether the evidence of guilt

was otherwise overwhelming, and (4) whether curative instructions were given and when. *Hearn v. Mintzes*, 708 F.2d 1072, 1077 (6th Cir.1983). The reviewing court is to use a probing analysis of the context to resolve the issue. *Raper, supra; United States v. Robinson*, 651 F.2d 1188 (6th Cir.1981), *cert. denied*, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 183 (1981).

■ When looked at in their proper context, the prosecution's statements were not an adverse comment on petitioner's right not to testify. In closing arguments, petitioner had, among other things, argued that the prosecution's case was insufficient because it had not proven motive.[24] To a large extent, the prosecution's arguments were in response. Wide latitude is given a prosecutor in rebuttal argument. *Angel v. Overberg*, 682 F.2d 605 (6th Cir.1982). Although the reply doctrine serves only to permit neutralization of improper defense argument and does not operate as a license for an improper affirmative attack, *United States v. Elkins*, 732 F.2d 1280, 1288 (6th Cir.1984), *United States v. Somers*, 496 F.2d 723 (3rd Cir.1974), *cert. denied*, 419 U.S. 832, 95 S.Ct. 57, 42 L.Ed.2d 58 (1974), *People v. Wise*, 134 Mich.App. 82, 351 N.W.2d 255 (1984), *lv. denied*, 422 Mich. 852 (1985), an otherwise improper argument is mitigated if made in response to a defense argument. *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir.1979), *cert. denied*, 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979).

\* \* \* \* \* \*
You'll see that after a period of time at the deceased's home, they left together in the Colt. You will also see after leaving they parted company, that Ricky Spalla drove back to New Baltimore to return the Colt.
\* \* \* \* \* \*
The evidence is also going to show that after the deceased and Ricky parted company, the deceased met up with someone, possibly more than one person, but it was someone else, that it was whoever he was with after parting company with Ricky Spalla he ended up north of Rochester on Snell Road and ended up dead.
II/632–635. At oral argument, petitioner's counsel acknowledged that trial counsel was merely "theorizing".

**22.** III/867.

**23.** At oral argument, petitioner's counsel asserted that the present case was exactly like *Rachel.* In *Rachel*, the prosecutor said, "we will never know, these men won't tell us. The only other man who could tell us is now dead and in his grave...." 590 F.2d at 202. *Rachel* is distinguishable. Here, the prosecutor did not state the reason that the motive was unknown was because petitioner was not talking but that petitioner had talked and had lied.

**24.** III/839–840.

The prosecution's argument as quoted above is not the complete story. Just before the prosecution said that petitioner shot and killed Furby but there was no evidence of the reason, the prosecution said: "And lastly, the Defense says, 'Well, the Prosecution hasn't proven any motive and people don't kill people without reasons.' I certainly don't quarrel with that. No doubt there was a very good reason. I shouldn't say 'a very good reason.' " [25] Immediately after the first quoted statement, the prosecution said that the jury need not find a motive to find petitioner guilty of murder.[26]

Just before the second quoted statement regarding consideration of the lack of evidence of a motive the prosecution argued: "The law recognizes the difficulty you have with a murder case and specifically says that [i.e., evidence of motive] is not required." [27] Consequently, I conclude that, when viewed in context, these arguments were in response to petitioner's argument about a lack of evidence of motive and were not intended as a comment on Petitioner's failure to testify. In *Steele v. Taylor*, 684 F.2d 1193, 1205 (6th Cir.1982), *cert. denied*, 460 U.S. 1053, 103 S.Ct. 1502, 75 L.Ed.2d 932 (1983), the Sixth Circuit said: "where, in context, a prosecutor's comment is reasonably subject to an interpretation other than as a comment on the defendant's failure to testify, clearly curative instructions will ordinarily eliminate the error."

After closing arguments, petitioner objected.[28] I accept the prosecution's response to the objection that he made the argument in the first two quoted paragraphs in response to petitioner's lack of evidence of motive argument and not as a comment on petitioner's right not to testify:

The first statement was clearly not a comment on the Defendant's silence.

The Defense had very strongly raised the fact that I had not been able to prove motive. It was obviously necessary for me to respond to that so I did and I said to the jurors, "How can you prove that? Who would know? Well, the killer would know. The evidence has shown the Defendant as the killer. You have placed before you a statement made by the Defendant and the Defense themselves have admitted, that it's a lie. The deceased might know but he's dead." With an explanation of why we, given the evidence we have, we can't show motive. I said nothing whatsoever about the Defendant's failing to take the stand. Obviously, he could take the stand and lie, too. The point is not whether or not he took the stand. The point is the only evidence before them was a statement from the Defendant—was a statement made by him that the Defense themselves admits is a lie.[29]

Furthermore, I do not construe the argument quoted in the third paragraph regarding what petitioner's counsel said in his opening as a comment on petitioner's right not to testify. Just prior thereto, the prosecution had summarized the evidence in the case.[30] I accept the prosecutor's statement that when he said "weigh all *that* evidence" he was referring to his own case and not to petitioner's lack of a case:

Secondly, with regard to the second statement I made where the Defense says that's a comment on their failure not to produce evidence. Not at all, I was talking about the evidence that had been produced. I went down the whole list of all the things we produced, asked the jury to put it all together. Then I said the Defense began their argument by saying that Ricky Spalla didn't kill Ron Furby. Take all of this evidence, all the evidence they had before them that I had put in and weigh it and you will find

25. III/864.

26. III/865.

27. III/865.

28. III/883.

29. III/884–885.

30. III/865–867.

that's not so. It was a comment on the quality of my proofs. It had nothing to do with what they did or did not do.[31]

Furthermore, as in *Steele*, during voir dire petitioner's counsel told the jury that petitioner might not testify.[32] During closing instructions, the trial court instructed the jury not only that counsels' arguments were not evidence but that Petitioner had the right not to testify and that the jury was "not permitted to consider his silence in [its] deliberations and [that] his silence must not influence [its] verdict in any matter whatsoever." [33]

In *United States v. Roberts*, 548 F.2d 665, 669 (6th Cir.1977), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2188, 53 L.Ed.2d 232 (1977), one of the defense attorneys had argued "indeed, you might ask yourselves, what were you doing at 3:15 on August 27, 1973?" In response, the prosecution stated, "do you think you would remember when you were arrested for bank robbery?" The Sixth Circuit held that the prosecution was entitled to its argument under the facts of the case. Likewise, I conclude that here, the prosecution's remarks fairly considered in context made in response to petitioner's arguments did not impermissibly comment on petitioner's right not to testify.

### IV.

■ Petitioner next argues that the trial court violated his right to a fair trial by refusing to grant jury requests for transcripts. Some time after the jury began its deliberations, it sent the trial judge a request through the bailiff stating "Transcript, please." When the trial court asked what this meant, the jury foreman answered: "what we mainly wanted was some of the times, a transcript of some of the times, what some of the witnesses said about some of the times that it took to get from the different points." In response, the trial court stated:

Well, again, it will take—hopefully you could remember it. If we have it typed up, we'll have to reach a decision what witness' testimony would have to be typed up and that will take some time.

Why don't you go back and see what you can do and if you can't reach a decision in a reasonable length of time without having these portions typed up, when we'll have to have it typed up, but it will require additional time.

With that, then, let's recess and see what you can do and if you can't reach a decision, we'll have to agree on—we'll have to get together with Counsel and agree on what witness' testimony would be used, what portion would be typed up and that will take some time.[34]

The next day, the jury requested the transcripts that have already been typed up to aid the attorneys in closing arguments. However, while the attorneys and the trial court were still considering how to respond to this request, the jury reached its verdict. Petitioner now argues that he was deprived of his Fourteenth Amendment right to a fair trial because the available transcripts could have influenced the deliberations.

Respondent argues that because Petitioner failed to timely object, the cause and prejudice standard of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) applies. This standard does not apply, however, if the state appellate courts did not invoke the procedural default rule in deciding the issue. *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979); *Hockenbury v. Sowders*, 620 F.2d 111 (6th Cir. 1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981). The Michigan Court of Appeals specifically addressed the merits of this issue and did not rely on a procedural default. Consequently, the cause and prejudice standard does not apply.

**31.** III/885.

**32.** I/188–605.

**33.** III/872.

**34.** III/888.

This issue, however, is not cognizable in a habeas proceeding. Errors in state law are not usually cognizable unless they rise to the level of depriving the petitioner of fundamental fairness. *Matlock v. Rose,* 731 F.2d 1236, 1242 (6th Cir.1984). After reviewing the record, I conclude that petitioner has failed to make this showing.

### V.

■ Petitioner also asks me to reconsider my earlier ruling that petitioner was not deprived of due process when he was charged in the information with an open count of murder and not specifically with first-degree murder. I decline. As stated on page 5 of my earlier opinion, "Petitioner has never claimed that he lacked notice of second-degree murder. Since he now stands convicted of second-degree murder and not first-degree murder, this particular notice claim is moot." An information charging petitioner with an open count of murder is "merely a state law claim and [does] not state an issue cognizable in a habeas proceeding."

Petitioner argues, on the other hand, that because the information did not specify the degree of murder, the state circuit court did not have jurisdiction. Citing *Hill v. United States,* 368 U.S. 424, 428–429, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962), and *Sunal v. Large,* 332 U.S. 174, 182, 67 S.Ct. 1588, 1592, 91 L.Ed. 1982 (1946), the Fourth Circuit in *Hailey v. Dorsey,* 580 F.2d 112, 115 (4th Cir.1978), *cert. denied,* 440 U.S. 937, 99 S.Ct. 1282, 59 L.Ed.2d 495 (1979), stated that in the absence of a fundamental defect, the error in a state procedural law "is cognizable in federal habeas corpus proceedings if, and only if, that failure means that the sentencing court had no jurisdiction to sentence the appellant to jail."

To the extent that *Hailey* accurately states the law in the Sixth Circuit, petitioner's claim still fails because the circuit court, according to Michigan law, did have jurisdiction. The information listed the statutory number for first-degree murder. Where the information lists the proper statutory number, jurisdiction is conferred on the circuit court. *People v. Covington,* 132 Mich.App. 79, 90, 346 N.W.2d 903 (1984), *lv. denied,* 419 Mich. 917 (1984) (Maher, J., concurring); *People v. Igaz,* 119 Mich.App. 172, 195, 326 N.W.2d 420 (1982), *lv. denied,* 418 Mich. 893, 341 N.W.2d 467 (1983). Moreover, even if the circuit court did not have jurisdiction for the charge of first-degree murder, it did have jurisdiction for the charge of second-degree murder. *People v. Calvin,* 60 Mich. 113, 122, 26 N.W. 851 (1886).

### VI.

Petitioner also asks me to reconsider my decision that the issue of whether the State of Michigan unconstitutionally deprived him of bail pending trial and pending his appeals violated his Eighth Amendment right to bail was moot. Because I have ruled against Petitioner on every other issue, however, I once again conclude that this issue is moot. *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982).

### VII.

Accordingly, the petition for writ of habeas corpus is DENIED.

SO ORDERED.